Norman Perlberger, Esquire (np4025)
POMERANTZ PERLBERGER & LEWIS LLP
21 South 12th Street, 7th Floor
Philadelphia, PA 19107                                    Attorney for Plaintiffs
(215) 569-8866
nperlberger@ppl-law.com

---

### IN THE UNITED STATES DISTRICT COURT OF NEW JERSEY

| | | |
|---|---|---|
| **PHYLLIS MOLNAR, and** | : | **CIVIL ACTION NO.** |
| **WILLIAM MOLNAR, W/H** | : | |
| **39 Shawnee Ridge Drive** | : | |
| **The Woodlands, Texas 77382** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **vs.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **MERCK & CO., INC.** | : | |
| **One Merck Drive** | : | |
| **White House Station, NJ, 08889** | : | |
| **Defendant** | : | |
| | : | |

---

### COMPLAINT

Plaintiffs, Phyllis Molnar and William Molnar, by way of Complaint against Merck,

upon information and belief, allege as follows:

### PARTIES

1.     Plaintiff, Phyllis Molnar ("Ms. Molnar"), is a citizen of the State of Texas, residing at 39

Shawnee Ridge Drive, The Woodlands, Texas 77382.

2.      Plaintiff, William Molnar, is a citizen of the State of Texas, residing at 39 Shawnee Ridge Drive, The Woodlands, Texas 77382.

3.      Defendant, Merck & Co., (hereinafter "Merck"), is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at One Merck Drive, White House Station, NJ, 08889.

## JURISDICTION

4.      Jurisdiction in this action is based upon diversity of citizenship, 28 U.S.C. Section 1332 (a), and that damages exceed, exclusive of interest and costs, the sum of Seventy-five Thousand ($75,000.00) Dollars.

5.      Venue lies in the District of New Jersey as Merck's headquarters and principal place of business are located in this District.

## OPERATIVE FACTS

6.      At all times relevant hereto, Merck was engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling, and marketing, either directly or indirectly through third parties or related entities, the pharmaceutical, Fosamax.

7.      At all relevant times, Merck was responsible for, or involved in, designing, manufacturing, marketing, developing, testing, labeling, promoting, distributing and/or selling its product, the prescription drug Fosamax.

8.      In September 1995, the United States Food and Drug Administration ("FDA") approved Merck's compound alendronate for various uses, including the treatment of osteoporosis and Paget's disease. Alendronate is marketed by Merck as "Fosamax."

9.      Fosamax falls within a class of drugs known as bisphosphonates, which are used for treating bone conditions such as osteopenia, osteoporosis and Paget's disease.   There are two classes

of bisphosphonates: the N-containing (nitrogenous) and non-N-containing (non-nitrogenous) bisphosphonates.   The nitrogenous bisphosphonates include the following: pamidronate (Aredia); ibandronate (Bondronat); and alendronate (Fosamax).    The non-nitrogenous bisphosphonates include the following: etrinodate (Didronel); clodronate (Bonefos and Loron); and tiludronate (Skelid). Alendronate contains a nitrogen atom.    The Physicians Desk Reference ("PDR") for Fosamax confirms that the molecule contains a nitrogen atom.

10.    Ms. Molnar, was prescribed Fosamax by her gynecologist, Dr. Eberhard Lotze, a number of years ago (at this time the exact date is unknown), allegedly because of her family history and bone density results indicating osteoporosis.

11.    After several years of use, in May 2003, Ms. Molnar sustained a fracture of her left hip and underwent an open reduction and internal fixation procedure ("ORIF") at St. John's Hospital, Nassau Bay, Texas.

12.    Because of poor healing and in order to relieve what was thought to be tension on the bone, Ms. Molnar underwent a second procedure to remove screws that had been inserted during the ORIF procedure in May.

13.    Prior to these surgeries and thereafter, Ms. Molnar continued to take Fosamax utilizing, at all times, the recommended dosages.

14.    On August 19, 2006, Ms. Molnar sustained a second fracture, this time to her right hip, and again underwent an ORIF procedure, this time performed by Dr. Michael J. Hanley at the Palestine Regional Medical Center, Palestine, Texas.

15.    Because it seemed that Fosamax was not preventing these fractures, Ms. Molnar suspended use of Fosamax after this second fracture.

16.     On September 5, 2006, Dr. Hanley (see #14 above), informed Ms. Molnar that examination of the bone during the ORIF procedure disclosed an abnormal bone that was "very brittle, dense and very hard" and that healing was proving to be difficult because of the quality of the bone.

17.     In or about September 2006, Dr. Hanley also opined that the hard and brittle nature of the bone was either due to Paget's disease or the long-term use of Fosamax. This was when Ms. Molnar first discovered that there was a causal connection between her use of Fosamax and her hip fractures. Paget's disease as a cause has since been ruled out.

18.     Thereafter, Ms. Molnar underwent a course of anabolic therapy and had salvage surgery on July 14, 2007 performed by Dr. Mark Brinker at the Texas Orthopedic Hospital, Houston, Texas and recently on December 6, 2007 suffered yet another fracture of her right femur, that required another surgery to attempt to stabilize her right hip by insertion of a 23 inch rod.

19.     Plaintiffs believe and aver that her fractures and condition of her bones are due to the harmful long-term effects of Fosamax use, none of which consequences were ever made known to her.

20.     Throughout the 1990's and 2000's, medical articles and studies appeared reporting the frequent and common occurrence of osteonecrosis of the jaw within the nitrogenous bisphosphonates used for chemotherapy.    As with its reported and acknowledged side effects concerning irritation, erosion, and inflammation of the upper gastrointestinal tract, Merck, particularly with its heightened knowledge and experience, knew or should have known that Fosamax, as a nitrogenous bisphosphonate, shared a similar adverse event profile to the other drugs within this specific subclass of bisphosphonates (i.e., those containing nitrogen).

21.     Merck, particularly with its heightened knowledge and experience, knew or should have known that bisphosphonates, including Fosamax, inhibit endothelial cell function.    Similarly, Merck, particularly with its heightened knowledge and experience, knew or should have known that

4

bisphosphonates also inhibit vascularization of the affected area and induce ischemic changes specific to patient's bone system and that these ischemic changes appear to be cumulative in nature.

22.     Merck, particularly with its heightened knowledge and experience, also knew or should have known that these factors combine to create a compromised vascular supply in the affected area. As a result, a minor injury or disease can turn into a non-healing wound.   That, in turn, can progress to widespread necrosis (bone death), hardening and brittling of the bone anatomy and ostemony elitis (inflammation of bone marrow).

23.     Shortly after Merck began selling Fosamax, reports of osteonecrosis of the jaw and other various dental complications among Fosamax users began surfacing, indicating that Fosamax shared the effects of other nitrogenous bisphosphonates.   Despite this knowledge, Merck failed to implement further study risk of osteonecrosis of the jaw or any other bone formation relative to Fosamax.   Rather than evaluating and verifying the safety of Fosamax with respect to osteonecrosis, Merck proposed further uses of Fosamax, such as Fosamax-D, and sought to extend the exclusivity period of Fosamax through 2018.

24.     While Fosamax has been marketed for the treatment of osteoporosis and Paget's disease, Merck has received adverse reaction reports from different users throughout the country that patients were experiencing hardness, brittleness and fracturing of the bone in the hip and long bone formations of patients having a long-term use of Fosamax.

25.     One such report appeared in an article written by Dr. Jennifer Schneider titled, "Should Bisphosphonates be Continued Indefinitely? An Unusual Fracture in a Healthy Woman on Long-Term Alendronate", Geriatrics 61(1): 31-33 (2006). Said article also reported on a fracture of a right femur after long-term use of Fosamax.

26.     Since Fosamax was released, the FDA has received a significant number of reports of osteonecrosis among users of Fosamax.

27.     On August 24, 2004, the FDA posted its ODS Postmarketing Safety Review on bisphosphonates, including Fosamax.   This was an epidemiologic review of the FDA adverse events database conducted by the FDA's Division of Drug Risk Evaluation.

28.     As a result of the FDA review, the FDA observed that the risk of osteonecrosis (of the jaw) was not confined to bisphosphonates used for chemotherapy.   The review indicated that the osteonecrosis was a class effect which specifically extended to the oral bisphosphonate, Fosamax.

29.     Thereafter, the FDA recommended and stated that the labeling for Fosamax should be amended by Merck to specifically warn about the risk of osteonecrosis (of the jaw). Merck refused to accede to the FDA's request.

30.     Rather than warn patients, and despite Merck's knowledge about the increased risk of osteonecrosis on patients using Fosamax, Merck continued to defend Fosamax, mislead physicians and the public, and minimize unfavorable findings.

31.     Merck has also refused to follow the advice of patients, who have experienced and reported brittleness, hardness and susceptibility to fractures, to report these adverse consequences to the FDA, physicians and the public, or to change any of its prescribing information, package inserts or drug manuals supplied to the medical and pharmaceutical professions and the general public.

32.     Fosamax is one of Merck's top selling drugs, averaging more that $3 billion a year in sales.

33.     Consumers, including Ms. Molnar, who have used Fosamax for treatment of osteoporosis, had several alternative safer products available to treat their condition.

34. Merck knew of the significant risk of health complications caused by ingestion of Fosamax, but Merck did not adequately and sufficiently warn consumers, including Plaintiffs, or the medical community, of such risks.

35. As a direct result, Ms. Molnar was prescribed Fosamax and has been permanently injured, having suffered serious injuries and damages from the ingestion of Fosamax. Ms. Molnar requires and will in the future require ongoing medical care and treatment.

36. Plaintiffs have suffered mental anguish from the knowledge that Ms. Molnar will have life-long complications as a result of the injuries Plaintiff sustained from the use of Fosamax.

37. As a direct and proximate result of using Fosamax, Plaintiff has suffered the injuries described above and is in current treatment for her condition, and has been required and will continue to be required to expend money in medical expenses to treat her injuries.

38. Ms. Molnar, as a direct and proximate result of using Fosamax, has suffered, and will continue to suffer severe mental and physical pain and suffering; and has sustained permanent injuries and emotional distress.

39. Ms. Molnar would not have used Fosamax had Merck properly disclosed the risks associated with the drug. Alternatively, if Ms. Molnar would have known of the risks of Fosamax, she would have been able to avoid the clinical manifestation of the symptoms as they currently exist.

40. Merck, through its affirmative misrepresentations and omissions, actively concealed from Ms. Molnar and her physicians the true and significant risks associated with taking Fosamax.

41. As a result of Merck's actions, Ms. Molnar and her prescribing physicians were unaware, and could not reasonably know or have learned through reasonable diligence, that Ms. Molnar had been exposed to the risks identified in this Complaint, and that those risks were the direct and proximate result of Merck's acts, omissions, and misrepresentations.

**COUNT I**
**PLAINTIFFS v. MERCK**
**PRODUCTS LIABILITY-FAILURE TO WARN (N.J.S.A. 2A:58C-2 *et seq.*)**

42.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

43.    Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, Fosamax, and in the course of same, directly advertised or marketed the product to the FDA, consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of Fosamax.

44.    Fosamax was under the exclusive control of Merck as aforesaid, and was unaccompanied by appropriate warnings regarding all possible adverse side effects and complications associated with the use of Fosamax, and the comparative severity, duration and the extent of the risk of injury with such use.

45.    Merck has failed to timely and reasonably warn of material facts regarding the safety and efficacy of Fosamax so that no medical care provider would have prescribed, or no consumer would have used Fosamax had those facts been made known to such providers and consumers.

46.    Merck has failed to perform or otherwise facilitate adequate testing in that such testing would have shown that Fosamax posed serious and potentially life-threatening side effects and complications with respect to which full and proper warnings accurately and fully reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA and the public, including Plaintiffs.

47.    Fosamax, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by

Merck, was defective due to inadequate post-marketing warnings and/or instruction because, after
Merck knew or should have known of the risk of serious and potentially life-threatening side effects and
complications from the use of Fosamax, Merck failed to provided adequate warnings to medical care
providers, the FDA and the consuming public, including Plaintiffs, and continued to promote Fosamax
aggressively.

48.     As direct and proximate result of the conduct of Merck as aforesaid, Ms. Molnar has
sustained injuries to her body including, but without limitation to brittleness, hardness, low bone
turnover, non-union of fracture post-surgery, ORIF and other surgical procedures including bone
grafting, susceptibility to fractures, multiple fractures, and ongoing treatment and therapy, debilitation
relegating her to a wheelchair with a non-weight bearing right leg, all of which are causing physical,
emotional and economic injury to Plaintiffs, and will continue indefinitely into the future.

49.     As a further direct and proximate result of the acts and omissions of Merck, Ms. Molnar
has been prevented from pursuing normal activities and employment, has experienced severe pain and
suffering and mental anguish, and has been deprived of ordinary pursuits and enjoyments of life.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory, treble and
punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the
Court deems proper.

**COUNT II**
**PLAINTIFFS v. MERCK**
**PRODUCTS LIABILITY  --  DEFECTIVE DESIGN (N.J.S.A. 2A:58C-2 *et seq.*)**

50.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if
set forth herein.

51.     Merck is a researcher, developer, manufacturer, distributor, marketer, promoter, supplier and seller of Fosamax, which is defective and unreasonably dangerous to consumers.

52.     The aforementioned drug is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.   The aforementioned drug is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than similar drugs on the market and is more dangerous than ordinary consumers can reasonably foresee.

53.     The defective condition of the aforementioned drug renders it unreasonably dangerous, and it was in this defective condition at the time it left the hands of Merck.   The aforementioned drug was expected to and did reach consumers, including Ms. Molnar, without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

54.     Plaintiffs were unaware of the significant hazards and defects in the aforementioned drug. The aforementioned drug was unreasonably dangerous in that it was more dangerous than would be reasonably contemplated by the ordinary user.   During the period that Plaintiff was taking the aforementioned drug, the medication was being utilized in a manner that was intended by Merck.   At the time Plaintiff received and consumed the aforementioned drug, it was represented to be safe and free from latent defects.

55.     Merck is strictly liable to Plaintiffs for designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of Merck because of the design defects.

56.     Merck knew or should have known of the danger associated with the use of the aforementioned drug, as well as the defective nature, but has continued to design, manufacture, sell,

distribute, market, promote and/or supply the aforementioned drug so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the foreseeable harm caused by the aforementioned drug.

57.     As direct and proximate result of the conduct of Merck as aforesaid, Ms. Molnar has sustained injuries to her body including, but without limitation to brittleness, hardness, low bone turnover, non-union of fracture post-surgery, ORIF and other surgical procedures including bone grafting, susceptibility to fractures, multiple fractures, and ongoing treatment and therapy, debilitation relegating her to a wheelchair with a non-weight bearing right leg, all of which are causing physical, emotional and economic injury to Plaintiffs, and will continue indefinitely into the future.

58.     As a further direct and proximate result of the acts and omissions of Merck, Plaintiff has been prevented from pursuing normal activities and employment, has experienced severe pain and suffering and mental anguish, and has been deprived of ordinary pursuits and enjoyments of life.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory, treble and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT III
### PLAINTIFFS v. MERCK
### PUNITIVE DAMAGES UNDER THE PRODUCTS LIABILITY ACT (N.J.S.A.2A:58C-1)

59.     Plaintiffs repeat and incorporate by reference all other paragraphs of Complaint as if fully set forth herein.

60.     Plaintiffs are entitled to punitive damages because Merck's failure to warn was reckless and without regard for the public's safety and welfare.   Merck misled both the medical community and the public at large, including Ms. Molnar herein, by making false representations about the safety of

Fosamax. Merck downplayed, understated and/or disregarded its knowledge of the serious and permanent side effects and risks associated with the use of Fosamax despite available information demonstrating that Fosamax was likely to cause serious and even fatal side effects to users.

61. Merck was or should have been in possession of evidence demonstrating that Fosamax caused serious side effects. Nevertheless, Merck continued to market Fosamax by providing false and misleading information with regard to safety and efficacy.

62. Merck failed to provide warnings that would have dissuaded physicians from prescribing Fosamax and consumers from purchasing and consuming Fosamax, thus depriving physicians and consumers from the true risks against the benefits of prescribing purchasing and consuming Fosamax.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages and punitive damages, together with interest, costs of suit and attorneys' fees and such other relief as the Court deems proper.

**COUNT IV**
**PLAINTIFFS v. MERCK**
**BREACH OF EXPRESS WARRANTY**

63. Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

64. Merck manufactured, sold, distributed, marketed, and/or promoted Fosamax used by Plaintiff, and this drug was expected to, and did reach Plaintiff without a substantial change in condition.

65. Merck, its agents and employees, in manufacturing, selling, distributing, supplying, marketing and/or promoting the drug Fosamax, expressly warranted that the drug was safe and effective as a medication for osteoporosis.

66.     Merck, its agents and employees, breached this warranty in that Fosamax was not safe and effective for its intended, reasonably foreseeable use as a medication for osteoporosis because of the serious risks of serious injuries to foreseeable users.

67.     Merck, its agents and employees, failed to provide adequate warnings with Fosamax, rendering it unreasonably dangerous and unfit for the intended, reasonably foreseeable purposes for which it is used, in breach of warranty.

68.     Ms. Molnar justifiably and detrimentally relied upon the warranties and representations of Merck in the purchase and use of the product.

69.     As direct and proximate result of the conduct of Merck as aforesaid, Ms. Molnar has sustained injuries to her body including, but without limitation to brittleness, hardness, low bone turnover, non-union of fracture post-surgery, ORIF and other surgical procedures including bone grafting, susceptibility to fractures, multiple fractures, and ongoing treatment and therapy, debilitation relegating her to a wheelchair with a non-weight bearing right leg, all of which are causing physical, emotional and economic injury to Plaintiffs, and will continue indefinitely into the future.

70.     As a further direct and proximate result of the acts and omissions of Merck, Plaintiff has been prevented from pursuing normal activities and employment, has experienced severe pain and suffering and mental anguish, and has been deprived of ordinary pursuits and enjoyments of life.

WHEREFORE, Plaintiffs demand judgment against Merck for compensatory damages, punitive damages and costs of suit as provided by law.

## COUNT V
## PLAINTIFFS v. MERCK
## VIOLATION OF CONSUMER FRAUD ACT

71.     Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if set forth herein.

13

72.     Fosamax is a "good" as that is defined in the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, hereinafter, the ("Act").

73.     Merck, is a "person", "company", or " seller" as that term is defined in the Act, and as such, is prohibited from engaging in deceptive acts and practices, as set forth more fully below.

74.     The Act prohibits deceptive acts and practices, including but not limited to passing off goods as those of another; representing that goods have specific sponsorship, approval, characteristics, ingredients, benefits, affiliation or status that they do not have; or engaging in fraudulent or deceptive conduct which creates the likelihood of confusion or misunderstanding.

75.     The following acts, uses or employments by Merck constitute unconscionable commercial practices, deceptions, frauds, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with intent that Plaintiffs rely upon such concealment, suppression or omission, in connection with the sale and marketing of Fosamax, are unlawful under the Act:

(a)     Merck, having undertaken the manufacturing, marketing, dispensing, distribution, and promotion of the drug described herein, owed a duty to provide accurate and complete information regarding this product;

(b)     Merck's advertising program, by affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of Fosamax was safe for human use and did not have unacceptable side effects;

(c)     On information and belief, Merck misrepresented to Plaintiffs and to members of the general public its knowledge about the propensities of the product to cause injuries such as those sustained by Plaintiff.    Merck concealed, failed to disclose, misstated, downplayed and understated the health hazards and risks associated with the use of

Fosamax. Merck falsely and deceptively kept relevant information from Fosamax users and minimized concerns regarding the safety of Fosamax to induce Plaintiff and the general public to purchase and use Fosamax;

(d) In justifiable and detrimental reliance on the truth of Merck's representations about the safety of Fosamax, Plaintiff purchased the product and used the product in the manner and for the purpose intended as represented and instructed by Merck; and

(e) The representations, misrepresentations, acts and omissions made by Merck deprived Plaintiff and other foreseeable users of Fosamax of the opportunity of free choice as to whether or not to expose themselves to the aforementioned dangers of ingesting Fosamax.

76. As a direct and proximate result of Ms. Molnar's lack of awareness of the dangers of Fosamax, caused by the acts and omissions of Merck, Plaintiff ingested Fosamax and developed the injuries and conditions set forth in this Complaint.

77. As a direct and proximate result of the acts and omissions of Merck, Plaintiff has been prevented from pursuing her normal activities and employment, has experienced severe pain and suffering and mental anguish, and has been deprived of ordinary pursuits and enjoyments of life.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages, punitive damages and costs of suit as provided by law.


**COUNT VI**
**PLAINTIFFS V. MERCK**
**NEW JERSEY PRODUCTS LIABILITY ACT**

78. Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

79.     Merck is liable to plaintiff pursuant to the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 *et seq*.

80.     Merck is under a duty to supply a product that is reasonably fit, suitable or safe for its intended use, such that it is not unreasonably dangerous and such that it does not cause injury to a reasonably foreseeable user.

81.     Merck has failed to meet the obligation of supplying a product that is reasonably fit, suitable or safe for its intended purpose and which is not unreasonably dangerous, in that they have placed the product Fosamax into the stream of commerce when Fosamax had been defectively manufactured, defectively designed and failed to contain adequate warnings, labels or instructions.

82.     Plaintiffs alleges that at all times, the product Fosamax was defective when it Merck's control and the product was not substantially altered prior to reaching Plaintiff.

83.     As direct and proximate result of the conduct of Merck as aforesaid, Ms. Molnar has sustained injuries to her body including, but without limitation to brittleness, hardness, low bone turnover, non-union of fracture post-surgery, ORIF and other surgical procedures including bone grafting, susceptibility to fractures, multiple fractures, and ongoing treatment and therapy, debilitation relegating her to a wheelchair with a non-weight bearing right leg, all of which are causing physical, emotional and economic injury to Plaintiffs, and will continue indefinitely into the future.

84.     As a further direct and proximate result of the acts and omissions of Merck, Ms. Molnar has been prevented from pursuing normal activities and employment, has experienced severe pain and suffering and mental anguish, and has been deprived of ordinary pursuits and enjoyments of life.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory damages, punitive damages and costs of suit as provided by law.

## COUNT VII
## PLAINTIFFS v. MERCK
## LOSS OF CONSORTIUM

85.    Plaintiffs repeat and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

86.    Plaintiff, William Molnar, is the husband of Plaintiff, Phyllis Molnar.

87.    As a result of the injuries suffered by his wife as aforesaid, Plaintiff, William Molnar, has and will in the future suffer the loss of usual services and consortium of his wife and has been required to provide special services and care to her.

WHEREFORE, Plaintiffs demand judgment against Merck for compensatory damages, punitive damages and costs of suit as provided by law.

Respectfully submitted,

**POMERANTZ PERLBERGER & LEWIS, LLP**

**NORMAN PERLBERGER, ESQUIRE**
**Attorney for Plaintiffs**

Dated: 12/24/07

# POMERANTZ PERLBERGER & LEWIS LLP

## ATTORNEYS AT LAW

7TH FLOOR, STEPHEN GIRARD BUILDING
21 SOUTH 12TH STREET
PHILADELPHIA, PA 19107-3603
TELEPHONE (215) 569-8866
FAX (215) 568-6511

NORMAN PERLBERGER+
GERALD JAY POMERANTZ
ELIOT HILLEL LEWIS

+ ADMITTED IN PA, NEW JERSEY, FLORIDA

NORMAN PERLBERGER      Ext. 103
nperlberger@ppl-law.com

**RECEIVED**

January 8, 2008

**JAN 1 4 2008**

AT 8:30_____M
WILLIAM T. WALSH
CLERK

Office of the Clerk
Room 4015, U.S. Court House
Martin Luther King Bldg.
50 Walnut Street
Newark, NJ  07101

*Trenton*

Re:  Molnar v. Merck & Co., Inc.  *(GEB)*
     Civil Action No. 08-cv-8

Gentlemen or Ladies:

Our office filed Complaint as captioned above last week, by electronic filing, but did not include Civil Cover Sheet or Summons.  My secretary was advised these could also be filed electronically, but I could not determine any way of doing so.  I am therefore enclosing the hard copies of both documents for appropriate filing.  Please return an executed Summons form to our office in the envelope provided, for our use should the defendant not be willing to execute a Waiver of Service of Summons.

Thank you very much.

Very truly yours,

NORMAN PERLBERGER

NP:net
Enc.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of      NEW JERSEY

PHYLLIS MOLNAR, and
WILLIAM MOLNAR, W/H

        V.

MERCK & CO., INC.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:   08-cv-8

TO: (Name and address of Defendant)

      MERCK & CO., INC.
      One Merck Drive
      White House Station, NJ    08889

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

      Norman Perlberger, Esquire
      Pomerantz, Perlberger & Lewis, LLP
      700 Stephen Girard Building
      21 S. 12th Street
      Philadelphia, PA    19107

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

WILLIAM T. WALSH        1/14/08

CLERK                                DATE

(BY) DEPUTY CLERK

AO 399 (12/93)

# WAIVER OF SERVICE OF SUMMONS

TO: _____ <u>Norman Perlberger, Esquire</u> _____
(NAME OF PLAINTIFF'S ATTORNEY OR UNREPRESENTED PLAINTIFF)


I acknowledge receipt of your request that I waive service of a summons in the action of

<u>Phyllis & William Molnar v. Merck & Co., Inc</u>, which is case number <u>08-cv-8</u>
(CAPTION OF ACTION)                                          (DOCKET NUMBER)

in the United States District Court for the _____ District of

<u>New Jersey - Newark</u> . I have also received a copy of the complaint in the action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule 4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me (or the party on whose behalf I am acting)

if an answer or motion under Rule 12 is not served upon you within 60 days after <u>Jan. 7, 2008</u>,
(DATE REQUEST WAS SENT)

or within 90 days after that date if the request was sent outside the United States.


<u>January 17, 2008</u>

DATE

*Christina Gaarder*
SIGNATURE
Christina Gaarder, Venable LLP, 2 Hopkins

Printed/Typed Name: ___ Plaza, Suite 1800, Baltimore, MD 21201

As <u>Outside Counsel</u> of <u>Merck & Co., Inc.</u>
(TITLE)                         (CORPORATE DEFENDANT)


**Duty to Amid Unnecessary Costs of Service of Summons**

Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons and complaint A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to waive service of a summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented plaintiff) a response to the complaint and must also file a Signed copy of the response with the court. If the answer or motion is not served within this time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer than if the summons had been actually served when the request for waiver of service was received.

08 CV 01802

A CERTIFIED TRUE COPY

FEB - 5 2008

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN 1 8 2008

FILED
CLERK'S OFFICE

**UNITED STATES JUDICIAL PANEL**
on
**MULTIDISTRICT LITIGATION**

RECEIVED
in Trenton
MAR 0 6 2008

AT 8:30_____M
WILLIAM T. WALSH
CLERK

IN RE: FOSAMAX PRODUCTS LIABILITY LITIGATION

| | |
|---|---|
| Phyllis Molnar, et al. v. Merck & Co., Inc., | ) |
| D. New Jersey, C.A. No. 3:08-8 | ) |
| Charlette Burns, et al. v. Merck & Co., Inc., | ) |
| E.D. Texas, C.A. No. 1:07-992 | ) |

MDL No. 1789

## CONDITIONAL TRANSFER ORDER (CTO-46)

On August 16, 2006, the Panel transferred four civil actions to the United States District Court for the Southern District of New York for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 444 F.Supp.2d 1347 (J.P.M.L. 2006). Since that time, 111 additional actions have been transferred to the Southern District of New York. With the consent of that court, all such actions have been assigned to the Honorable John F. Keenan.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Southern District of New York and assigned to Judge Keenan.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Southern District of New York for the reasons stated in the order of August 16, 2006, and, with the consent of that court, assigned to the Honorable John F. Keenan.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Southern District of New York. The transmittal of this order to said Clerk shall be stayed 15 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 15-day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

Inasmuch as no objection is
pending at this time, the
stay is lifted.

FEB - 5 2008

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

A CERTIFIED COPY
J. MICHAEL McMAHON, CLERK

BY
DEPUTY CLERK



# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### OFFICE OF THE CLERK
MARTIN LUTHER KING JR. FEDERAL BLDG & U.S. COURTHOUSE
50  WALNUT STREET, P.O. BOX 419
NEWARK,  NEW JERSEY 07101

**CAMDEN OFFICE**
MITCHELL H. COHEN U.S. COURTHOUSE
ONE JOHN F. GERRY PLAZA
FOURTH & COOPER STREETS, ROOM 1050
CAMDEN,  NEW JERSEY  08101

WILLIAM T. WALSH
CLERK

March 6, 2008

**TRENTON OFFICE**
CLARKSON S. FISHER U.S. COURTHOUSE
402 EAST STATE STREET,  ROOM 2020
TRENTON, NJ  08608

**REPLY TO:   TRENTON**

**J. Michael McMahon, Cler**k
U.S. District Court - Southern District of New York
500 Pearl Street
New York, New York 10007

> RE:    PHYLLIS MOLNAR, et al., vs.  MERCK & CO., INC.,
> CIVIL 08-8(GEB)
>
> **Your Number: Civil 08-1802**
> **MDL 1789, In Re: FOSAMAX PRODUCTS LIABILITY LITIGATION**

Dear Mr. McMahon:

Enclosed please find the file in the above captioned matter which was transferred to your district pursuant to an order of the MultiDistrict Litigation Panel received in this Office on March 6, 2008, a certified copy of which is enclosed.  Also enclosed is a certified copy of the docket entries in this case.

Kindly acknowledge receipt of the above on the enclosed copy of this letter and return in the envelope provided.  Thank you for your anticipated cooperation.

Sincerely,

William T. Walsh, Clerk

By:

s/Michael D. Shanklin, Supervisor

cc:    Hon. Garrett E. Brown, Jr., U.S. District Judge
Hon. John J. Hughes, U.S. Magistrate Judge

**RECEIPT ACKNOWLEDGED BY:_____    DATE:_____**